**[ORAL ARGUMENT HELD OCTOBER 24, 2016]**

No. 16-5086

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

METLIFE, INC.,

*Plaintiff-Appellee*,

v.

FINANCIAL STABILITY OVERSIGHT COUNCIL,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The District Of Columbia

## SUPPLEMENTAL BRIEF FOR APPELLEE

Eugene Scalia
  *Counsel of Record*
EScalia@gibsondunn.com

Indraneel Sur
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y. 10166
Telephone: (212) 351-2474
Facsimile: (212) 716-0875

Amir C. Tayrani
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Appellee MetLife, Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................3

ARGUMENT .......................................................................................................5

    I.      FSOC Failed To Assess MetLife's Vulnerability To Material
          Financial Distress ...................................................................................5

    II.     FSOC Did Not Consider Mitigants Or Quantify Losses In Its
          Exposure Transmission Analysis .........................................................6

    III.   FSOC Failed To Apply An Historically Grounded, Quantitative
          Model And To Give Adequate Weight To State Regulation In
          Its Asset Liquidation Analysis .............................................................9

    IV.   FSOC Ignored The Consequences Of Designating MetLife ..............12

    V.    FSOC Refused To Consider Alternatives To Designation Or To
          Provide Its Most Relevant Precedents To MetLife ............................14

CONCLUSION ..................................................................................................15

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Statutes**

12 U.S.C. § 5323(a)(1)....................................................................................3

12 U.S.C. § 5323(a)(2)(K) ...........................................................................13

**Other Authorities**

Presidential Memorandum for the Secretary of the Treasury,
    2017 WL 1421320 (Apr. 21, 2017) ........................................................4

U.S. Dep't of Treasury, *A Financial System That Creates Economic
    Opportunities: Asset Management and Insurance* (Oct. 2017)...........3

**Regulations**

12 C.F.R. pt. 1310, App. A, § II(a)................................................................9

## INTRODUCTION

The flaws that prompted the district court to rescind MetLife, Inc.'s designation as a nonbank systemically important financial institution have now been confirmed by the chair of the Financial Stability Oversight Council ("FSOC"), Treasury Secretary Steven T. Mnuchin.  The Report on Financial Stability Oversight Council Designations prepared by the Treasury Secretary lays bare serious shortcomings in FSOC's designation analyses and underscores that its Final Designation of MetLife was arbitrary, capricious, and contrary to both the Dodd-Frank Act and FSOC's Final Rule and Interpretive Guidance.  *See* Addendum to Supp. Br.

Treasury admits in the Report that, when designating MetLife, FSOC could have undertaken several analyses that it claimed to lack the authority or capacity to perform.  In particular, Treasury emphasizes that FSOC should "assess the likelihood of a firm's material financial distress as part of its determination."  Report 27.  Yet, FSOC argued to this Court that consideration of MetLife's likelihood of experiencing material financial distress was analytically impossible, *see* FSOC Br. 24, and that it was therefore appropriate to "assume material financial distress at" MetLife.  JA389.  Treasury likewise concedes that "[t]here is *no question* that the Council has the discretion under the [Dodd-Frank Act] to consider the direct and indirect costs of designation."  Report 27 (emphasis added).  In designating MetLife, however, FSOC refused to consider the effects of designation on the compa-

ny, JA391, and argued in this Court that the Dodd-Frank Act actually *prohibits* a consideration of costs, *see* FSOC Reply 22.

Treasury also highlights several considerations that FSOC indisputably had the authority to weigh when designating MetLife but inexplicably ignored.  For example, Treasury concludes that FSOC's "exposure transmission" analysis "should take into account factors that would reduce [counterparties'] losses" and "should quantify th[ose] losses," Report 11, 24; that FSOC's asset liquidation analysis should consider "historical examples" and "the ability of . . . state insurance regulators . . . to impose stays on policyholder withdrawals," *id.* at 25-26; and that FSOC should "prioritize . . . an industry-wide or activities-based approach" over company-specific designations, *id.* at 20.  In its Final Designation, however, FSOC "merely summed gross potential market exposures, without regard to collateral," and "never projected what the losses would be," JA803 (emphasis omitted); ignored the absence of historical precedent for a mass policyholder run on any insurer and dismissed submissions from state insurance regulators confirming that they would intervene to stop a policyholder run on MetLife, JA506-07; and refused even to consider what is now Treasury's preferred, activities-based approach.

Finally, the Treasury Report confirms grave procedural shortcomings in the designation process, including the lack of transparency and fair process caused by FSOC's decision to release only "high-level explanations" to the public regarding

2

its first three designations, Report 33, which left MetLife without access to FSOC's most relevant precedents as it made its case against designation.

Each of the fatal deficiencies highlighted by the Treasury Report requires rescission of the Final Designation.[1]

## BACKGROUND

On April 21, 2017, the President of the United States directed the Secretary of the Treasury—who also serves as the chair of FSOC—to "conduct a thorough

---

[1] While this Brief focuses on the ways that the Treasury Report shows MetLife's designation to have been legal error, there are also sharp *policy* conflicts between the Report and the government's position in this appeal. The government here defends a company-specific designation, but Treasury's position is that such designations are a disfavored last resort because they lead to "competitive disadvantages and unnecessarily burdensome regulatory requirements." Report 19; *see also* U.S. Dep't of Treasury, *A Financial System That Creates Economic Opportunities: Asset Management and Insurance* 97 (Oct. 2017) ("entity-based systemic risk evaluations of insurance companies generally are not the best approach for mitigating risks"), *available at* goo.gl/7Xb2oK. Treasury urges FSOC to "leverage the expertise" of primary regulatory agencies, Report 8, whereas FSOC ignored the views of MetLife's state regulators, *see* MetLife Br. 15, 47. Treasury stresses "[m]aintain[ing] a level playing field among firms," Report 8, but FSOC discounted the competitive harms that designation would cause MetLife, *see* MetLife Br. 53. In this litigation, MetLife has repeatedly emphasized that reasoned risk analysis requires using *plausible* scenarios, *see, e.g.*, MetLife Br. 42; FSOC has countered by implying that the word "could" in 12 U.S.C. § 5323(a)(1) means that plausibility is irrelevant, *see, e.g.*, FSOC Br. 23-26, but Treasury agrees with MetLife, stating that FSOC "should identify risks only where they may *plausibly* arise." Report 24 (emphasis added). Finally, Treasury emphasizes "minimiz[ing] burdens" and deems designation appropriate "only when the expected benefits to financial stability exceed the costs imposed on the *designated firm*," Report 8, 23 (emphasis added), which is at odds with FSOC's position that "the costs that designation may impose" on MetLife are irrelevant, FSOC Br. 51.

review of the FSOC determination and designation processes" and to "provide a written report to the President." Presidential Memorandum for the Secretary of the Treasury § 1, 2017 WL 1421320 (Apr. 21, 2017). The Secretary issued the Report on November 17, 2017.

The Treasury Report concludes that FSOC should "prioritize its efforts to address risks to financial stability through a process that emphasizes an activities-based or industry-wide approach." Report 10. Treasury further emphasizes that, to the extent FSOC pursues company-specific designations, it is "imperative" that FSOC's "analyses be rigorous, transparent, and consistent." *Id.* at 23. To meet these analytical requirements, FSOC should undertake an "assessment of the likelihood of a firm's material financial distress"; "take into account factors that would reduce the losses a nonbank financial company's counterparties and other market participants would experience in the event of the company's material financial distress"; "quantitatively evaluate . . . the means by which a company's asset fire sale could disrupt trading"; pursue "deep engagement with a nonbank financial company's primary financial regulator"; designate a nonbank financial company "only when the expected benefits to financial stability exceed the costs imposed on the designated firm"; and "publicly release" its designation decisions (with necessary redactions). *Id.* at 9-12, 32.

FSOC did none of these things when designating MetLife.

4

## ARGUMENT

**I.    FSOC Failed To Assess MetLife's Vulnerability To Material Financial Distress.**

The Treasury Report confirms that FSOC erred at the outset of its designation inquiry by failing to evaluate MetLife's vulnerability to experiencing material financial distress.

In the Final Designation, FSOC simply "assume[d] material financial distress at" MetLife without any assessment of the likelihood that the company would actually experience distress.  JA389.  FSOC defends its assumption of material financial distress in this Court by arguing that it is essentially impossible "to predict whether and exactly how a specific company might fail."  FSOC Br. 24.

In its Report, however, Treasury admits that an assessment of "the likelihood of a firm's material financial distress" is both feasible and necessary.  Report 27.  Treasury explains that "[s]ound risk regulation requires consideration of not only the impact of an identifiable risk, but also the likelihood that the risk will be realized," and emphasizes that the "Council's designation process should not operate outside this long-accepted model of effective regulation."  *Id.* at 26-27.  In fact, FSOC undertook an assessment of likelihood of distress with respect to four other nonbank financial companies that it declined to designate because they were not likely to experience material financial distress.  *See* MetLife 28(j) Letter (Mar. 2, 2017) (discussing House staff report regarding designations).

5

To be sure, Treasury does not take a position on whether FSOC's Final Rule and Interpretive Guidance mandates an assessment of a company's vulnerability to material financial distress. Report 26. But the Report leaves no doubt that, even if the Final Rule and Interpretive Guidance did not compel a vulnerability assessment, FSOC would have been required to consider vulnerability under the Dodd-Frank Act because, as the Report makes clear and common sense confirms, "[m]aterial financial distress at a nonbank financial company does not pose a threat to U.S. financial stability if the company will not experience material financial distress." *Id.* at 27. Legislation that authorized FSOC to make a designation determination—a decision that has "serious implications for affected entities, the industries in which they operate, and the U.S. economy"—in the absence of a vulnerability assessment would be irrational and cannot be reconciled with the principles of "[s]ound risk regulation" that underlie the Act. Report 9, 26; *see also* MetLife Br. 29-30.

## II.    FSOC Did Not Consider Mitigants Or Quantify Losses In Its Exposure Transmission Analysis.

The Treasury Report also identifies serious flaws in FSOC's exposure transmission analysis.

Treasury states that an "*equally relevant* factor" in evaluating a company's exposures "is the extent to which those exposures are mitigated," and faults FSOC for lacking "any specific standard with regard to how it considers mitigants." Re-

6

port 24 (emphasis added). FSOC "should identify risks only where they may plausibly arise—not where the risk is sufficiently offset by mitigants" such as collateral—and "[t]his framework should quantify the losses that each of [the company's] counterparties would suffer in the event of its distress." *Id.*

FSOC failed to take these steps when designating MetLife. As the district court explained, FSOC "merely summed gross potential market exposures, without regard to collateral or other mitigating factors," and "refused" to "reduce exposure estimates by an expected recovery rate." JA803, JA805. FSOC "refrain[ed] from calculating actual loss[es]" and "stop[ped] short of projecting what could actually happen if MetLife were to suffer material financial distress." JA805.

These shortcomings are particularly acute with respect to FSOC's treatment of MetLife's securities lending program. Treasury acknowledges that "securities lending activities" are "[o]ften . . . fully collateralized" and that, "[i]n those cases, the potential for the exposure to serve as a channel for the transmission of risk is remote." Report 24; *see also* MetLife Br. 38. That is precisely the case with respect to MetLife's securities lending program. DDCJA1693. FSOC ignored that collateralization. *See* MetLife Br. 33-41.

In this Court, to excuse its back-of-the-hand treatment of collateral and refusal to estimate actual losses, FSOC cites "the inherent uncertainty in predicting the precise course of a hypothetical crisis" and the supposedly "limited value" of

"historical precedents regarding recovery rate." FSOC Br. 46, 48. Treasury admits in its Report, however, that "taking into account factors that would reduce [counterparties'] losses" and "quantify[ing] the losses that each . . . counterpart[y] would suffer" are not only feasible but indispensable steps in a reasoned designation determination. Report 24.

FSOC's lack of regard for the risk-mitigating effects of collateral is just one of the many ways in which, as Treasury describes it, FSOC presented "a laundry list of potential risks" without "identify[ing] risks [that] . . . may plausibly arise." Report 24, 36; *see also* MetLife Br. 35-39 (discussing other examples). FSOC's systematic failure to distinguish between plausible and entirely speculative risks is likely attributable in part to its persistent refusal to give weight to the views of state insurance regulators. Treasury emphasizes that FSOC "can benefit from deep engagement with a nonbank financial company's primary financial regulator"—including by "shar[ing] [with them] its preliminary views regarding potential risks at the company"—which "can help the Council understand the plausibility of theoretical risks." Report 32. Yet when designating MetLife, FSOC refused to credit (or even address) the dissenting views of the Independent Member with Insurance Expertise and the non-voting State Insurance Commissioner Representative, and rejected the recommendations of MetLife's primary regulators and others with deep expertise in the business and regulation of insurance. *See* MetLife Br. 15, 47.

By these errors, FSOC departed from its Final Rule and Interpretive Guidance, which required FSOC to assess whether counterparties' exposures to MetLife were "significant enough *to materially impair*" counterparties, 12 C.F.R. pt. 1310, App. A, § II(a) (emphasis added), and flouted the principles of reasoned risk analysis mandated by the Administrative Procedure Act.

**III.    FSOC Failed To Apply An Historically Grounded, Quantitative Model And To Give Adequate Weight To State Regulation In Its Asset Liquidation Analysis.**

The Treasury Report likewise exposes fatal shortcomings in FSOC's application of its asset liquidation analysis.

Treasury admits that "not all of the Council's evaluations have included a rigorous quantitative impact assessment" of "the impact that the particular company's asset liquidations could have on other firms and broader markets."  Report 25. Treasury faults FSOC for "not attempt[ing] to calculate estimates of the extent to which it believes counterparties or policyholders might withdraw in extreme but plausible circumstances" and urges FSOC to "generat[e] quantified scenarios for runs on a financial institution" that are "based on historical examples."  *Id.* at 25-26.

These essential attributes of reasoned risk assessment are absent from the Final Designation of MetLife.  FSOC's asset liquidation analysis was premised on the far-fetched proposition that, in the event of material financial distress at Met-

Life, retail policyholders would terminate their coverage *en masse* and trigger an asset fire sale by MetLife. JA504-07, JA526-28. Treasury criticizes FSOC for precisely this type of unreasoned assessment of policyholder behavior, noting that FSOC "did not, in all cases, perform extensive analyses to attempt to assess how an insurance company's annuity holders and life insurance policyholders would actually behave." Report 57. Treasury further recognizes that "retail policy holders do not universally withdraw their policies from an insurer in material financial distress" and that "retail insurance products that are available for immediate surrender or withdrawal are generally considered to be long-term liabilities, as these products may include features or characteristics that disincentivize withdrawals." *Id.* at 25, 26.

The Report also underscores the implausibility of FSOC's assumption that neither MetLife itself nor the company's state regulators would take steps to stop a mass policyholder run. Treasury makes clear that "the Council's analyses should highlight, in a clear manner, the ability of an insurance company and of its state insurance regulators to substantially reduce the potential risk of a company's asset liquidation by exercising their existing authorities to impose stays on policyholder withdrawals." Report 26. Yet, the Final Designation assumed that MetLife would *not* invoke its contractual deferral right, despite MetLife's unequivocal representations to the contrary. JA 507; DDCJA1760-61, DDCJA1763. FSOC also assumed

10

that state regulators would not intervene to stop a policyholder run and that, if they did, their intervention would exacerbate the situation by undermining policyholder confidence and causing a run on *other* insurers. *See* JA452-53, 500, 506-07.

FSOC's fact-defying suppositions were unsupported by any historical evidence. Indeed, the record demonstrated that state regulators commonly place moratoria on surrenders when an insurer fails, with no resulting crisis of confidence, and MetLife's state regulators explicitly said they would intervene in the event that the company experienced material financial distress. *See* MetLife Br. 47. This phantom risk of a run on MetLife is another example of FSOC's failure to credit the views of MetLife's primary regulators to "help [it] . . . understand the plausibility of theoretical risks at the company." Report 32.

In addition, Treasury endorses "a consistent approach to [FSOC's] analysis of the order in which a company may liquidate its portfolio of investment assets," "taking into account factors such as the benefits of selling highly liquid assets first . . . and any regulatory requirements that may affect the order in which a company could liquidate its portfolio." Report 26. In the Final Designation, however, FSOC employed a "Monte Carlo" simulation in which it assumed that MetLife would sell its assets in *random order*, even though that approach is fundamentally incompatible with the fiduciary obligations that would require MetLife to liquidate assets in a systematic manner that minimizes losses. *See* MetLife Br. 49.

11

The ill-defined, historically unfounded, and downright illogical asset liquidation analysis applied by FSOC in its Final Designation is a far cry from the "rigorous, clear, and transparent" procedures that Treasury deems necessary to "assure[ ]" both "[p]ublic accountability and due process."  Report 8-9.  The Report confirms what the district court already found when condemning the Final Designation as arbitrary and capricious:  FSOC "hardly adhered to any standard" at all in "assessing MetLife's threat to U.S. financial stability."  JA803.

## IV.    FSOC Ignored The Consequences Of Designating MetLife.

The Treasury Report reinforces the district court's conclusion that FSOC improperly refused to consider the effects of designating MetLife, including whether the designation could actually make MetLife more likely to experience material financial distress.

Treasury admits that FSOC should designate a nonbank financial company for Federal Reserve oversight "only when the expected benefits to financial stability exceed the costs imposed on the designated firm."  Report 23.  "[T]here can be no confidence on that point," Treasury underscores, "unless the Council weighs the costs and benefits of its actions."  *Id.* at 27.

Despite "the serious implications" of a designation "for affected entities," Report 9, FSOC refused to consider the effects of designation on MetLife.  JA391.  As a result, there is no assurance that the designation will actually "do[ ] more

good than harm," which, the district court and Treasury agree, is essential to determining that "agency action is appropriate." Report 27; *see also* JA808, JA811.

According to FSOC, the Dodd-Frank Act *prohibits* it from considering the consequences of designation and instead requires that it remain oblivious to the effects on the regulated company or even the economy at large. *See* FSOC Reply 22 ("The statute does not invite the Council to consider whether regulation and Federal Reserve supervision will be effective. Congress itself made that judgment."). But in its Report, Treasury admits that "[t]here is *no question* that the Council has the discretion under the statute to consider the direct and indirect costs of designation—which may be risk-related, and indeed risk-enhancing, in some respects." Report 27 (emphasis added); *see also* 12 U.S.C. § 5323(a)(2)(K) (authorizing FSOC to consider "any other risk-related factors that [it] deems appropriate").

Thus, at a minimum, FSOC was required to explain *why* it elected not to exercise its discretion to consider the effects that designation could have on MetLife. FSOC never provided that explanation, other than the manifestly inadequate assertion that "the relative cost and benefit of a Council determination is not one of the" statutorily *mandated* considerations. JA391. In reality, it would be impossible for FSOC to formulate a reasonable rationale for subjecting MetLife to the "serious consequences" that accompany designation without paying any heed to "the ex-

13

pected benefits . . . [and] costs that designation would impose." Report 16, 27; *see also* MetLife Br. 52-53.

**V.    FSOC Refused To Consider Alternatives To Designation Or To Provide Its Most Relevant Precedents To MetLife.**

Finally, the Treasury Report highlights two procedural deficiencies in FSOC's designation of MetLife: its failure to consider an activities-based approach and its refusal to provide MetLife with copies of its prior designations.

Treasury explains that FSOC should "prioritize . . . an industry-wide or activities-based approach" to "assess[ing] potential risks to financial stability." Report 20. "Rather than designating individual firms," Treasury continues, FSOC should "look to primary regulators to address the risks through regulation within and across industries," *id.*, which is the "type of collaborative approach" that FSOC took with respect to money market mutual funds and the asset-management industry, *id.* at 21; *see also id.* at 52-54. Despite FSOC's prior experience with an activities-based approach—and its "broad discretion in determining how to respond to potential threats to financial stability," *id.* at 19—FSOC failed even to consider Treasury's preferred approach as an alternative to designating MetLife or to provide any explanation for its single-minded focus on the "blunt instrument" of a company-specific designation. *Id.* at 10; *see also* MetLife Br. 57-58.

Treasury also criticizes FSOC for releasing only superficial "public" versions of the three designation decisions that preceded MetLife's designation. Re-

14

port 33, 34. Those "high-level explanation[s] of the reasons for the Council's decisions" were merely "12 to 14 pages" in length, *id.* at 33, and were the only versions of the prior designations available to MetLife when it was under consideration for designation. FSOC refused MetLife's repeated requests for access to full-length, redacted versions of those highly relevant precedents, *see* MetLife Br. 60, yet Treasury now concedes that the full decisions could have been made available, as recently was done with FSOC's "de-designation" of AIG. *See* MetLife 28(j) Letter (Oct. 17, 2017).

## CONCLUSION

Before designating a nonbank systemically important financial institution, FSOC must evaluate the company's vulnerability to material financial distress, assess the losses that the company's counterparties would experience, apply historically grounded and quantifiable models to determine the effects of an asset sale, consider the consequences that designation would have for the company, and evaluate an activities-based alternative to a company-specific designation. The Treasury Report confirms that each of these steps is permissible, practicable, and essential to reaching a reasoned designation determination that is factually supported and furthers the Dodd-Frank Act's regulatory objectives. Because FSOC took none of those steps before it designated MetLife, its Final Designation cannot stand.

Dated:  December 12, 2017

Respectfully submitted,

*/s/ Eugene Scalia*
Eugene Scalia
   *Counsel of Record*
EScalia@gibsondunn.com

Indraneel Sur
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y.  10166
Telephone:  (212) 351-2474
Facsimile:  (212) 716-0875

Amir C. Tayrani
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Counsel for Appellee MetLife, Inc.*

16

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume requirement established by this Court's Order of November 28, 2017, which authorized supplemental briefs of up to 15 pages; and

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Eugene Scalia*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of December, 2017, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the Court's appellate CM/ECF system.  I also hereby certify that I caused eight paper copies to be delivered to the Clerk's Office.  Service was accomplished on the following using the Court's CM/ECF system:

Mark B. Stern
  mark.stern@usdoj.gov
Daniel Tenny
  daniel.tenny@usdoj.gov
Nicolas Y. Riley
  nicolas.y.riley@usdoj.gov
Civil Division, Room 7215
U.S. Department Of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-1838

*/s/ Eugene Scalia*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
EScalia@gibsondunn.com